The court will now move to the fifth case of the morning's call, Taylor v. McCament. Mr. Burton.  My name is Justin Burton, excuse me, may it please the court, my name is Justin Burton and I'm here on behalf of the appellant Thomas Taylor. This case arises under direct appeal of the district court dismissing this matter of your appellant's petition for writ amendamus and APA action compelling the release of U visas or certain unused visas over a period of eight years. The backlog of pending U visa cases and cases that have been temporarily approved awaiting U visas have grown to an epic proportion. The wait list for pending cases now presently remains roughly 103,000 cases that remain waiting U visas. The failure of at least 80,000 of these U visas can be traced to the malfeasance or at worst sheer neglect of the executive branch of our government from 2000 to 2008. In 2000, Congress enacted the Victims of Trafficking and Violence Protection Act of 2000. This act provided for 10,000 U visas to be issued per year for victims of crimes. This was endorsed by law enforcement agencies, the Federal Bureau of Investigation and other agencies in order to bring unlawfully present people and immigrants out of the shadows to report these crimes. In order to be eligible, they were required to establish that they were a victim of one of the enumerated crimes as described by the act, provided assistance to a law enforcement agency, and received a substantial injury as a result of the subject crime. Five years went by. Nothing was done. No regulations were passed. A policy memorandum was issued by the then Immigration and Naturalization Service in 2001 just identifying that a U visa has now been passed through Congress. Nothing was done in terms of a federal regulation. Nothing was done whatsoever in moving the statute forward with the intent of Congress being prohibited. In 2005, Congress enacted the Violence Against Women Act, which grew out of the frustration of Congress not being able to have the executive branch push forward their statutes. In the Violence Against Women Act, it required 180 days for regulations to be published. These regulations are required to be published on July 4, 2006. Again, the executive branch ignored this, and until October 2007, when regulations were finally passed, those applicants for U visas were still unable to seek those U visas. In December of 2008, fact sheets were finally dispersed by the Department of Homeland Security. FAQs, or Frequently Asked Questions, were also dispersed almost a month thereafter. And on January 1, 2009, over eight years since the first enactment of the Victims of Traffic and Violence Protection Act of 2000, was a U visa finally issued. This action here and today requests that this Court compel DHS to release the 80,000 visas that went unused over the period of eight years. The question below went towards standing, and whether Mr. Taylor had standing in order to pursue his claim, and whether he had a personal stake in the outcome. Mr. Taylor filed an application for a U visa. It's now been temporarily approved, awaiting for a visa to be allocated to him. Where is he in line, do you know? I was able to go through some of the numbers because they're published, and it looks like he's roughly around 30,000, 35,000 in line. They're still working on issuing. Meaning 35,000 are ahead of him? Are ahead of him. And so there remains a rather lengthy line awaiting the final disposition of his case. Meanwhile, he remains at the whim of the executive branch. They could lift his deferred action on the case. They can lift any of these people's deferred action on the case, and move forward with removal proceedings against any one of these people on the line. Hence the importance in securing your U visa status. In order to remain standing, the appellant must demonstrate that he suffered injury in fact. The injury is traceable to the appellees, which we think we can easily establish both of those. But the bigger question is whether a favorable decision in his case will provide the proper redress to his injury. When asking for redress, when asking for the release of these 80,000 numbers, this has been addressed on a couple of occasions, at least by the district courts and the appellate courts. In the de-reverse, the INS, in 2002, there was a diversity lottery applicant, which is a little different but substantially the same in seeking visas here in the United States. In the context of diversity lotteries, an applicant can go forward to seeking their lawful permanent resident status within that given year. The difference in U visa context as opposed to the diversity context is that those people seeking diversity lotteries or applications are thrown to the side after that fiscal year is completed. In the de-re case, this court ruled that unfortunately after that year has passed, those people remain ineligible for their lawful permanent resident status in that case or one of those allocated numbers available to them. In the U visa context, this differs. It differs in the fact that the applications still remain awaiting for these visa numbers. In this case, the visa numbers do exist. There are 80,000 numbers that exist and a number that would be available to Mr. Taylor if this court would allow him to go forward in that regard. Were all 80,000 identified as someone? There were not. I mean, that just happens to be the quota for each year. They don't have people that are identified as being eligible. That's correct. There seems to be this line that's awaiting, that's been temporarily approved awaiting these numbers, but these numbers still remain. They're unused for the period of the eight-year time period. How many are like your client who has applied? Right now, roughly 137,000, I think, by last count. There's 103,000 that's been temporarily approved. So you, that have been temporarily approved? 103 that's been temporarily approved. And what is the status of your client? My client, from estimation, because he was approved about a year ago, remains at about 30 or 35,000 in this line. So you go, that's a temporary approval, as you would call it. Precisely. And that's where you put him at about 35,000 ahead of him. Unfortunately, there remains a rather large queue for all these people that are trying to seek benefits here. Mr. Burton, even if we fashioned a remedy that you seek and directed the agency, how do they get around the statutory cap that limits their authority? It's been addressed previously in the context of asylum. In the asylum context, under the Refugee Act of 1980, it provided 10,000 people per annum can secure their lawful permanent residency here in the United States. Those are people who have been granted refugee status or asylum. And it went and proceeded from 1980 until 2004, when there's a lawsuit filed in Minnesota. And what happened was, back then, the Department of Homeland Security, or the Immigration and Naturalization Service, failed to allocate 22,000 of those numbers during those years with precisely the same verbiage as the U Visa statutes had in allocating their numbers. So the judge in that case called it a national outcry. And what they did was, they said, fine, those 22,000 visas that failed to be allocated in those years were then provided to those people in 2004. Ultimately, what ended up happening is Congress lifted the cap altogether for asylees. That's exactly right. And they received it. But we do not have a cap here that's been expanded. But even before it was expanded, the judge in that case allowed it to open up for at least the 22,000 that went unused during that period of time. There remains that existence of a redress, at least in the bare minimum of opportunities. I'd like to reserve my time at this point. Thank you, Mr. Burton. Thank you. We'll hear now from Ms. Bingham. May it please the court. My name is Lauren Bingham, and I represent the government in this case. The district court below was correct in dismissing appellant's case, and the government asks that that decision be upheld for the following reasons. First, because the appellant lacks standing. Specifically, he fails all three prongs of the standing test. First, he has suffered no injury. His U Visa has not been denied. Instead, he is placed on the waiting list in accordance with the regulations. Second, his alleged injury is not traceable to the defendants in this case. The backlog is due to the huge increase in filings in the U Visa context, not because of the delay in issuing the regulations. Thirdly, and most importantly, and what the district court focused on below, is that there is no redressability of his alleged injury. And that's because of what Your Honor alluded to earlier, which is that there is a clear 10,000 visas per year limit, and there is no way to get around that. Finally, as the district court held, even if he had standing, he's failed to state a claim. I want to talk about a few things that my colleague brought up. One, it's not that these visas went unused. It's that there's a limit on these visas. So there's no rollover mechanism to preserve these visas in the statute. And Congress used the word shall, which is a very clear congressional directive. I'd also like to, again, focus on a point here, which is that the pending cases here in the backlog is due to the voluminous filings. These filings have increased, as I cited in our brief. The numbers have just gone up year over year. With regard to the redressability point, my colleague has brought up the Adir case. In that case, this court held that the requested relief was illusory. The failure to obtain a diversity visa within that fiscal year was fatal to their claim. And that was because there simply was no visa to issue after that fiscal year was over. That is the same situation here in that there simply is no more than 10,000 visas per year to issue. However, the case is distinguishable because it is not fatal to Mr. Taylor's claim in this case. Instead, Mr. Taylor remains on the wait list. He has deferred action. He has employment authorization, as does his wife, who is a derivative beneficiary. And when his turn on the wait list comes up, presuming nothing has changed in his eligibility, he will receive a U visa. Are there any further questions for me? In that case, the government would rest on... Apparently not. Oh. Apparently not. Okay. In that case, the government would rest on its briefs, Your Honor, and ask that the disreport decision be affirmed. Thank you. Thank you, Ms. Bingham. Mr. Burton has two minutes. I'll wait about a year. Thank you, Mr. Burton. The case will be taken under advisement, with our thanks to both counsel.